UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————X

FREDERICK REHBERGER,

                              Plaintiff,

                                                        Case No. CV-05-0210 (JS) (ARL)

            -against-

                                                        Hon. Joanna Seybert

MRW GROUP, INC.,

                              Defendant.
————————————————————————X

## PLAINTIFF'S PROPOSED FINDINGS
## OF FACT AND PROPOSED CONCLUSION OF LAW

                              DOLLINGER, GONSKI & GROSSMAN
                              Attorneys for Plaintiff
                              One Old Country Road
                              P.O. Box 9010
                              Carle Place, New York 11514
                              (516) 747-1010

## PROPOSED FINDINGS OF FACT

### HISTORICAL FACTS

1.      On or about January 15, 1987, The Mills-Muller-Wood Corp. and Richtberg & Rehberger, Inc. entered into a merger agreement titled "Agreement and Plan of Consolidation" to form a new corporation, MRW GROUP, INC. ("MRW GROUP").

2.      On or about June 19, 1987, FREDERICK REHBERGER ("REHBERGER"), Richard Richtberg ("Richtberg"), Alan Wren ("Wren") and others, entered into a Shareholders Agreement ("Shareholders Agreement") which, among other things, set forth the rights, duties and obligations of the shareholders with respect to MRW GROUP ("Plaintiff's Exhibit "15") (T.18-19).[1]

3.      The Shareholders Agreement has not been modified (Plaintiff's Exhibit "16") (T.19, 39).

4.      On or about June 19, 1987, REHBERGER, Richtberg, Wren and others also entered into a Stock Redemption Agreement which, among other things, set forth the rights, duties and obligations of the shareholders in MRW GROUP (the "Stock Redemption Agreement") (Plaintiff's Exhibit "16") (T.19).

5.      The Stock Redemption Agreement has not been modified (Plaintiff's Exhibit "16, p. 14) (T.19, 42).

6.      At all times herein mentioned, REHBERGER is and/or was the holder of 25.668% of the shares of common stock of MRW GROUP.

---

[1] Bracketed numbers beginning with "T" refer to pages in the Trial Transcript of the Trial conducted on July 16 and 17, 2007 before the Honorable Joanna Seybert.

1

7.      Article IV of the Stock Redemption Agreement states that when a stockholder attains the age of sixty (60), he can require the other stockholders and/or the corporation itself to "buy-out" his shares of stock for the value stated in Article VI (Plaintiff's Exhibit "16").

## REHBERGER'S ELECTION TO RETIRE

8.      REHBERGER made a determination to retire and sell his shares of stock in MRW GROUP.

9.      Pursuant to the provisions of the Stock Redemption Agreement, by letter dated November 19, 1999, Rehberger advised MRW GROUP that he elected to sell his shares of stock in MRW GROUP when he attained the age of sixty, in accordance with the last stipulated value of MRW GROUP which was Seven Million ($7,000,000.00) Dollars.

10.     The sum which REHBERGER was entitled to be paid pursuant to the Stock Redemption Agreement was not paid.

## STATE COURT ACTION

11.     On June 30, 2000, plaintiff commenced a Declaratory Judgment Action in the Supreme Court of the State of New York, County of Suffolk, under Index No. 00-15318 against the shareholders of the defendant, MRW GROUP, and the corporation, MRW GROUP, entitled, "Frederick Rehberger v. Richard O. Richtberg, et al." (the "State Court Action").

12.     The Complaint in the State Court Action sought a Declaratory Judgment establishing the value of all of the outstanding shares of stock of the MRW GROUP at $7,000,000.00, for purposes of enforcement of the parties' Stock Redemption Agreement.

13.     By Order of State Court Justice Elizabeth H. Emerson dated May 3, 2001 and filed in the Office of the Clerk of the County of Suffolk on May 8, 2001, summary judgment was

2

granted in favor of REHBERGER and against the MRW GROUP and the Complaint was dismissed insofar as it was asserted against the individual defendants (Plaintiff's Exhibit "1").

14.     MRW GROUP timely filed a Notice of Appeal and perfected its appeal from the May 3, 2001 Order in the State Court Action.

15.     MRW GROUP moved in the State Court Action for leave to renew the summary judgment motions, claiming that it lacked adequate surplus and would be rendered insolvent if required to pay the plaintiff in accordance with the Agreement.

16.     By Order dated August 27, 2001, Justice Emerson of the Suffolk County Supreme Court modified her prior Order so as to provide that any payments to the plaintiff from MRW GROUP should be limited to years in which a surplus is available for that purpose (Plaintiff's Exhibit "2").

17.     By Judgment Dated November 8, 2001 and Entered on November 20, 2001, Justice Emerson Ordered, Adjudged and Decreed (Plaintiff's Exhibit "3"), as follows:

> 1.     That the stipulated value of 100% of common stock of the defendant corporation is Seven Million Dollars ($7,000,000.00).
>
> 2.  That the plaintiff is the owner of 25.668% of the common stock of the defendant corporation.
>
> 3.  That the plaintiff's offer of delivery of his stock to the defendant corporation occurred on November 24, 1999.
>
> 4.  That the dollar value of plaintiff's 25.668% of the defendant corporation is One Million Seven Hundred Ninety Six Thousand Seven Hundred Sixty Dollars ($1,796,760.00).

3

**5. That the defendant, MRW GROUP, INC. shall become obliged to purchase FREDERICK REHBERGER'S shares in the corporation pursuant to Articles III & IV of the June 19, 1987 Shareholders' Agreement and any payments to the plaintiff shall be limited to years in which a surplus is available for that purpose in accordance with New York Business Corporation Law Sections 513 and 514.**

18.    By Decision and Order dated June 17, 2002 (Plaintiff's Exhibit "4"), the

Appellate Division, Second Department affirmed the Lower Court Order insofar as appealed from,

and remitting the matter to the Supreme Court, Suffolk County, for entry of the Judgment declaring

that the value of the outstanding shares of common stock of MRW GROUP is $7,000,000.00.

19.    The Appellate Division held, in pertinent part, as follows:

The plaintiff, a shareholder in the defendant MRW Group, Inc. (hereinafter MRW), a closely-held corporation, commenced this action for a judgment declaring that the value of all of the outstanding shares of common stock of MRW is $7,000,000. He brought this action in connection with his demand, pursuant to the shareholders' agreement, that MRW purchase all of his shares in the corporation at a pre-established price when he reached the age of 60.

The Supreme Court properly granted that branch of the plaintiff's motion which was for summary judgment on his complaint against MRW. Where the terms of a written contract are clear and unambiguous, the courts will enforce it according to its terms (see W.W.W. Assocs. v. Giancontieri, 77 NY2d 157; Automotive Mgt. Group v. SRB Mgt. Co., 239 AD2d 450). Here, the shareholders' agreement provided, in relevant part, that each year, the stockholders and MRW would agree upon the value of each share of stock, and that such value would 'be the purchase price for each share of stock.' However, it also provided that in the event that MRW and the

4

shareholders failed to agree to a particular value, the last stipulated value was to control. It is undisputed that prior to the plaintiff's demand that MRW purchase his shares of stock upon his reaching the age of 60, MRW and its shareholders failed to stipulate to a share value other than the $7,000,000 value set for all outstanding shares in the shareholders' agreement.

MRW's remaining contentions are without merit.

**Since this is an action for a declaratory judgment, we remit the matter to the Supreme Court for the entry of a judgment declaring that the value of the outstanding shares of common stock of MRW is $7,000,000 (see Lanza v. Wagner, 11 NY2d 317, appeal dismissed 371 US 74, cert denied 371 US 901).**

## AMOUNT REQUIRED TO BE PAID
## BY MRW GROUP TO REHBERGER

20. The amount required to be paid to plaintiff by the defendant for the purchase of the REHBERGER shares by MRW is the amount of $1,796,760.00 plus interest ("State Court Award") (Plaintiff'S Exhibit "3').

21. Plaintiff has not been paid any of the State Court Award except for the sum of $15,000.00 (T.91).

## RELIEF REQUESTED OF THIS COURT

22. REHBERGER seeks judgment of this Court declaring that MRW GROUP was not insolvent and was in a surplus situation at all times since REHBERGER's election was made, and that MRW GROUP is required to perform under Articles III and IV (the "Buy-Out Provisions") of the Stock Redemption agreement (Plaintiff's Exhibit "16").

5

23. After REHBERGER made his election to retire in November, 1999, MRW GROUP should have proceeded to purchase his stock in MRW GROUP as required by Article III of the Buy-Out Provisions (Plaintiff's Exhibit "16", p. 9), and a closing should have taken place within a reasonable time thereafter.

24. At the closing, which should have taken place in or about January, 2000 pursuant to Article III of the Buy-Out Provisions, MRW GROUP should have paid REHBERGER 10% of the purchase price, in the ~~approximate~~ sum of $179,676.00.

25. Thereafter, fifteen months after that closing date, on or about April 1, 2001, the first of the forty-eight (48) consecutive quarterly payments provided for in the Buy-Out Provisions became due and payable.

26. The principal sum due, after deducting the 10% down payment, and not including interest, was $1,617,760.00.

27. Pursuant to the Buy-Out Provisions, the purchase price was required to be paid in forty-eight (48) quarterly installments (Plaintiff's Exhibit "16", p. 4-5).

28. Based upon a commencement date of April 1, 2001, 15 months after the closing, quarterly payments were due in April, July, October and January of each year from April, 2001 through April, 2013.

29. As of August, 2007, had MRW GROUP complied with the Stock Redemption Agreement, it would have paid the down payment of $179,676.00 and twenty-five (25) quarterly payments of $33,689.25, plus interest.

30.      As of August, 2007, MRW GROUP should have paid the principal sum of

$842,213.24 plus interest calculated at the minimum rate permitted by the Internal Revenue Code

for Installment Sales (Plaintiff's Exhibit "16", p. 4-5).

31.      Plaintiff seeks judgment of this Court directing the payment by MRW

GROUP to REHBERGER of the following sums to be applied in reduction of the amount due

pursuant to the State Court Award as of August, 2007:

> (a)      the sum of money elected to be paid by MRW GROUP to its employees as Profit Sharing during the years 2002, 2003, 2004 and 2005, in the cumulative sum of $316,647.00 (Plaintiff's Exhibits "7", "8" and "19") (T.106-108);

> (b)      the value of the "book of business" transferred to Wren by MRW GROUP in consideration for the purchase by MRW GROUP of the Wren Shares in 2005 having a value of at least $250,000.00 (T.14);

> (c)      the sum of $80,000.00 per year, payable monthly, on a going forward basis, representing the sum heretofore paid by MRW GROUP to its employees for Profit Sharing commencing retroactively to the calendar year 2006 (Plaintiff's Exhibits "7", "8" and "19") (T.106-108) totaling $160,000.00;

> (d)      a sum equal to the monthly payments heretofore paid by MRW GROUP to Travelers Group ("Travelers") on a monthly basis retroactively from May 1, 2004, in the amount of $13,851.00 totaling $554,040.00 (Plaintiff's Exhibit "19", p. 9 and "7", p. 9).

32.      Plaintiff also seeks judgment of this Court directing the payment by MRW

GROUP to REHBERGER of quarterly payments of principal and interest in accordance with the

terms of the Stock Redemption Agreement in such an amount and until such time as the sums due thereunder are paid in full.

## SOLVENCY OF MRW GROUP

33.    MRW GROUP has been solvent at all times since at least the calendar year 2000.

34.    MRW GROUP admits that it has paid its bills since 1990 on a reasonably timely basis (T.71-72, 84, 87).

35.    MRW GROUP admits that it was not made insolvent by its purchase of the Wren Shares (T.81).

## THE TRAVELERS LOAN

36.    On January 10, 1990, MRW GROUP borrowed $3,200,000.00 or more from Aetna Casualty and Surety Company ("Aetna") (T.20, 70).

37.    At some point thereafter, the loan was assigned by Aetna to Travelers (T.20).

38.    The purpose of the loan was to acquire as treasury stock certain stock of MRW GROUP owned by former shareholders of MRW GROUP (T.20, 70), a covenant not to complete and to pay deferred compensation (Plaintiff's Exhibit "19", p. 9).

39.    The unpaid balance on the Travelers loan as of December 31, 2002 was $247,991.00. The unpaid balance was $95,122.00 as of December 31, 2003 (Plaintiff's Exhibit "19"). Therefore, the principal balance of the loan was reduced by the sum of $129,869.00 during 2003. Monthly payments of principal and interest were made by MRW in repayment of the Travelers loan in varying amounts from $33,000.00 to $13,851.00.

40.    The principal balance of $95,122.00 was paid off in 2004 (T.22, 138).

41.    Richtberg testified that the Traveler loan was paid in full as of April 1, 2004 (T.22).

42.    The sum of money that was previously earmarked for monthly payment to Travelers was thereafter available to be paid to REHBERGER commencing as of May 1, 2004 and continuing thereafter monthly until the State Court Award is paid in full.

## INCOME TAX OVERPAYMENTS

43.    MRW GROUP's 2004 U.S. Corporate Income Tax Return signed by Richtberg (Plaintiff's Exhibit "10") indicates at line item 35-36, page one, that there was an overpayment of taxes in the amount of $10,983.00 which was elected by MRW GROUP to be credited to 2005 estimated tax.

44.    MRW GROUP's 2005 U.S. Corporate Income Tax Return signed by Richtberg (Plaintiff's Exhibit "11") indicates at line item 35-36, page one, that there was an overpayment of taxes in the amount of $43,934.00, which was to be credited to 2006 estimated tax.

45.    Each of the overpayments evidence the solvency of MRW and the existence of surplus.

## THE WREN BUY-OUT

46.    Prior to July of 2005, Wren held 10.7 shares of stock of MRW GROUP ("Wren Shares").

47.    In July, 2005, Wren sold the Wren Shares to MRW GROUP which purchased the shares as treasury shares (T.28-29).

9

48.     MRW GROUP acknowledges that it did not obtain the required 80% consent of the MRW GROUP shareholders to modify the terms of the Stock Redemption Agreement to obtain the required consent to purchase of the Wren Shares (T.42) ( Plaintiff's Exhibit "16", p. 14).

49.     As a result of the sale of the Wren Shares, Richtberg's personal ownership interest in MRW GROUP increased from 57.75% in 2004 to 64.67% in 2005 (Plaintiff's Exhibit "10") (T.19, 131).

50.     The sale by Wren of the Wren Shares and MRW GROUP's purchase of those shares was not done in accordance with the requirements of the Stock Redemption Agreement.

51.     The Restrictive Covenant imposed upon each shareholder selling his shares of stock in MRW GROUP under the Stock Redemption Agreement was not imposed upon Wren.

52.     A "book of business" in the insurance industry is a volume of insurance that is written by a producer (T.33).

53.     "Books of business" can be purchased and sold (T.33). The purchase of a "book of business" is a way to increase gross revenue for a company such as MRW GROUP (T.33).

54.     In consideration for Wren's sale of the Wren Shares, MRW GROUP agreed with Wren as follows:

(a)     MRW GROUP assigned to Wren the identified "book of business" that was owned by MRW GROUP and, up until the transfer to Wren, generated income for the company (Plaintiff's Exhibit "17") (T.35, 45, 47); and

(b)     MRW GROUP committed itself to pay Wren 50% of the commission earned during the following two renewal periods from any accounts that were part of the "book of

business" referred to above, that chose to remain as a client of MRW GROUP (Plaintiff's Exhibit "17", p. 4) (T.44-45).

55.    Richtberg testified that the purchase by MRW GROUP of the Wren Shares by MRW GROUP did not render MRW GROUP insolvent (T.81).

56.    If MRW GROUP had not transferred the "book of business" to Wren in consideration for the purchase of the Wren Shares, the income attributable to such "book of business" would have continued to benefit MRW GROUP.

57.    The transfer of the "book of business" to Wren constituted the transfer of an asset of MRW GROUP having a value of at least $250,000.00 (T.14).

58.    MRW GROUP purchased the Wren Shares with knowledge of REHBERGER's judicially determined prior claim.

59.    MRW GROUP's purchase of the Wren Shares evidences MRW GROUP'S solvency and the existence of a surplus.

## RETAINED DEFICIT

60.    MRW GROUP reported a Retained Deficit ("Retained Deficit") on its Financial Statements as follows:

| Year End | Amount | Plaintiff's Exhibit |
|----------|--------|---------------------|
| 1999 | ($1,255,229.00) | 5 |
| 2000 | ($1,300,446.00) | 5 |
| 2001 | ($1,339,588.00 | 6 |
| 2002 | ($1,259,668.00) | 6 |
| 2003 | ($1,252,703.00) | 7 |

11

| 2004 | ($1,241,372.00) | 7 |

61.     The Retained Deficit, as explained by Richtberg, is a book entry that relates to the buying out of former shareholders of MRW GROUP in 1990 (T.70).

62.     Howard Fielstein ("Fielstein"), a Certified Public Accountant, who the attorney for the plaintiff consented to being acknowledged by the Court as a forensic accounting expert (T.117), testified that the Retained Deficit is not payable to anyone, has no impact on taxes, and has no impact on anything related to the conduct of business of MRW GROUP (T.122, 127).

63.     Fielstein further testified that the existence of a Retained Deficit does not impact MRW GROUP's solvency or the existence of a surplus.

64.     This Court accepts as true Mr. Fielstein's testimony that the Retained Deficit has no impact upon the financial status or the conduct of the business of MRW GROUP.

### REPAIRS AND MAINTENANCE

65.     MRW GROUP is a tenant maintaining offices at three locations on Long Island (T.57).

66.     The home office located at 70 Main Street is owned by an entity owned by Richtberg and REHBERGER and leased to MRW GROUP (T.58). The other two locations occupied by MRW GROUP are similarly occupied under leases with unrelated third parties (T.58).

67.     The MRW GROUP Financial Statements reflect annual expenses for "Repairs and Maintenance" as follows:

| Year | Amount | Plaintiff's Exhibit |
|------|--------|---------------------|
| 1999 | $ 57,495.00 | 5 |
| 2000 | $ 86,720.00 | 5 |

12

| 2001 | $ 91,501.00 | 6 |
| 2002 | $135,034.00 | 6 |
| 2003 | $155,943.00 | 7 (T.64) |
| 2004 | $136,871.00 | 7, 8 |
| 2005 | $140,110.00 | 8 |

68.     MRW GROUP annually paid for "Repairs and Maintenance" work performed, in part, by Woodside Maintenance, an entity owned by Richtberg's son, Mark (T.59-60).

69.     Richtberg could not explain what work was performed that resulted in the expenditure of the substantial annual sums identified as "Repairs and Maintenance" (T.60, 65-66).

70.     Richtberg's claim that "Repairs and Maintenance" expenses covered work performed on the computer system (T.61) is belied by the fact that the Schedule of General and Administrative Expenses has a separate listing for "computer fees and services" (Plaintiff's Exhibits "5", "6", "7" and "8") (T.63).

71.     As a tenant in three office locations, Richtberg testified that most of the expenses for "Repairs and Maintenance" were paid by the landlord (T.58).

72.     Defendant, MRW GROUP, had the opportunity to justify the annual substantial expense for "Repairs and Maintenance", but declined to do so.

## PROFIT SHARING AND MATCHING 401K CONTRIBUTION

73.     MRW GROUP established a 401K Profit Sharing Plan (the "Profit Sharing Plan"), which was available to all eligible employees. Under the Profit Sharing Plan, employees contribute up to 15% of their gross wages, up to the maximum allowed by law. MRW GROUP

13

elected to contribute matching contributions dollar for dollar, up to 3% of each employee's contribution, up to the annual maximum of $3,000.00 per employee (Plaintiff's Exhibits "7", "8").

74.     MRW GROUP also has elected to contribute up to 2% of employees' wages for employees who are not participants in the 401K plan (Plaintiff's Exhibits "7", "8").

75.     MRW GROUP's Financial Statements for 2002, 2003, 2004 and 2005 establish that MRW GROUP had sufficient surplus to provide its employees with a percentage of the company's profits in the form of Profit Sharing Plans.

76.     MRW GROUP elected to and did contribute the following sums to the Profit Sharing Plans:

| Year | Amount | Plaintiff's Exhibit |
|------|--------|---------------------|
| 2002 | $80,955.00 | 19 |
| 2003 | $73,559.00 | 7, 19 |
| 2004 | $75,653.00 | 7, 8 |
| 2005 | $86,480.00 | 8 (T.106-108) |

77.     Since 1990, notwithstanding electing to fund the Profit Sharing Plan, MRW GROUP has paid its bills in a reasonably timely fashion (T.71-72).

78.     The elective payment of the Profit Sharing Plan evidences both the solvency of MRW and the existence of a surplus each year from at least 2002 to date.

79.     MRW GROUP acknowledges that the payment of each of the contributions to the Profit Sharing Plan were payments that MRW GROUP elected to pay. (T.107-108).

14

## CUSTOMER DEPOSITS

80.     In MRW GROUP's Financial Statements under "Liabilities and Stockholder's Equity, Current Liabilities", MRW GROUP reflects "Customer's deposits" as follows:

| Year | Amount | Plaintiff's Exhibit |
|------|--------|---------------------|
| 2001 | $   273,224.00 | 6 |
| 2002 | $   950,351.00 | 6 |
| 2003 | $1,220,692.00 | 7 |
| 2004 | $1,605,538.00 | 7, 8 |
| 2005 | $1,682,379.00 | 8 |

81.     MRW GROUP's Financial Statements do not evidence a line item for "Customer deposits" as an Asset of MRW GROUP (T.113, 126).

82.     Fielstein testified that he would have expected to see such a line item (T.126-127).

83.     "Customer deposits" should appear under Current Assets in the Financial Statements since they are premium deposits and trust funds, paid to MRW GROUP for remittance to the insurance company entitled to be paid the respective premiums (T.113).

84.     This Court accepts as true Mr. Fielstein's conclusion that if "Customer deposits" are included as a Current Liability of MRW GROUP in its Financial Statements, such a similar line item for "Customer deposits" is also required to be shown in an equal amount as an asset in the Current Asset portion of the Financial Statements.

85.     MRW GROUP failed to call any witness to contradict the conclusion related to such trust funds presented by Mr. Fielstein.

15

## THE "GOING CONCERN" QUALIFICATION

86.     A "going concern" qualification in a company's financial statement prepared by an accountant indicates that the accountant is concerned about the ability of the company to continue to operate on a going forward basis (T.124-126).

87.     MRW GROUP utilized the accounting services of the accounting firm of certified public accountants, Sabino & McIntyre, from its inception through the present (T.125).

88.     The Financial Statements prepared for MRW GROUP by Sabino & McIntyre only contain a "going concern qualification" in the years 1993 and 1996 (T.124).

89.     The deletion of a "going concern qualification" from MRW GROUP's Financial Statements in subsequent years evidences that after 1996 MRW GROUP's accountants were not concerned about MRW GROUP's ability to continue in business (T.124-125).

## SOLVENCY AND SURPLUS

90.     Fielstein determined that MRW GROUP is solvent (T.130, 140).

91.     Fielstein determined that MRW GROUP is in a surplus situation (T.130).

92.     Fielstein determined that the presence of a Retained Deficit on MRW GROUP's books and records has no impact on the financial status of MRW GROUP (T.130-131).

93.     Fielstein determined that subsequent to the satisfaction of the Travelers Loan in 2004, the financial status of MRW GROUP did not change with the exception that employee salaries increased and gross income increased (T.139).

94.     There is no evidence that contradicts Fielstein's conclusions.

### GROSS RECEIPTS OR SALES

95.     The Internal Revenue Service Forms 1020 filed on behalf of MRW GROUP

for the calendar years 2004 and 2005 (Plaintiff's Exhibits "10", p. 1 and "11", p. 1) evidence "Gross

Receipts or sales" as follows:

| Year | Amount |
|------|--------|
| 2004 | $5,333,724.00 |
| 2005 | $5,619,245.00 |

### MRW GROUP'S CASH BALANCES

96.     MRW GROUP's Financial Statement Balance Sheet reflect Cash under

Current Assets as of the end of each respective year as follows:

| Year | Amount | Plaintiff's Exhibit |
|------|--------|---------------------|
| 2003 | $ 547,251.00 | 7 (T.140-141) |
| 2004 | $1,031,469.00 | 6, 8 |
| 2005 | $1,079,669.00 | 8 |

97.     The existence of cash at the end of the year under Current Assets further

evidences MRW GROUP's solvency and the existence of surplus.

17

## PROPOSED CONCLUSIONS OF LAW

1.     The ability of MRW GROUP to repay the Travelers Loan, the Income Tax Overpayments, the Wren Buy-Out, the excessive and unexplained payment of Repairs and Maintenance, the elective matching of 401(k) Profit Sharing Plan, and cash balances through the years, are evidence of the fact that MRW GROUP is solvent and has a surplus from which REHBERGER can be paid.

2.     The New York Business Corporation Law ("BCL") §513 permits a corporation to redeem its shares as treasury shares if the corporation is solvent and will not thereby be made insolvent.  Shares may be redeemed only out of surplus.

3.     BCL §102 defines "surplus" as the excess of net assets over stated capital. Actual value, rather than book value, is determinative of the existence of a surplus.  Vowteras v. Argo Compressor Service Corp., 83 A.D.2d 834, 441 N.Y.S.2d 562 (2nd Dept. 1981), app. den., 55 N.Y.2d 605, 447 N.Y.S.2d 1028, 432 N.E.2d 603 (1982).

4.     BCL §102 defines "net assets" as the amount by which total assets exceed total liabilities.  Stated capital and surplus are not liabilities.

5.     BCL §102 defines "stated capital" as

> [t]he sum of (A) the par value of all shares with par value that have been issued, (B) the amount of the consideration received for all shares without par value that have been issued, except such part of the consideration therefor as may have been allocated to surplus in a manner permitted by law, and (C) such amounts not included in clauses (A) and (B) as have been transferred to stated capital, whether upon the distribution of shares or otherwise, minus all

18

reductions from such sums as have been effected in a
manner permitted by law.

6.    MRW GROUP's stated capital is $10,386.00 as is shown in each Financial

Statement under the caption of Liabilities and Stockholders' Equity (Plaintiff's Exhibits "5", "6", "7",

"8", "19").

7.    In cases arising prior to the adoption of the statute, it has been held that for

the purpose of determining whether a surplus exists so that a corporation may purchase its own

stock, the test is not whether the corporation had a book surplus or deficit, but whether it had an

actual surplus or deficit. 14 N.Y.Jur.2d, <u>Business Relationships</u>, §301.

8.    In determining such question, the increased value of capital assets and the

value of corporate good will may be considered. <u>Id.</u>

9.    The possibility that a corporation may not be able to purchase its shares under

BCL §513 is not a ground for denying to either party specific performance of an agreement for the

purchase by a corporation of its own shares, if at the time for performance the corporation can

purchase all or part of such shares under BCL §513. See <u>Gold v. Lippman</u>, 539 F.2d 866 (2nd Cir.

1976); 20B Carmody-Wait 2d, <u>New York Practice</u>, §121:630.

10.    It is well-settled that in an action to enforce a contract for redemption, the

burden of proof rests upon the defendant to establish that it would be illegal to proceed with the

redemption. <u>Nakano v. Nakano McGlone Nightingale Advertising, Inc.</u>, 84 Misc.2d 905, 377

N.Y.S.2d 996, 1000.

11.    The corporation, MRW GROUP, bears the burden of proving that redemption

will render it insolvent and that it lacks sufficient surplus to purchase its own shares. <u>Vowteras v.</u>

<u>Argo Compressor Service Corp.</u>, <u>supra</u>; <u>Application of Androtsakis</u>, 159 A.D.2d 442, 553 N.Y.S.2d 123 (1st Dept. 1990); <u>AJW Partners, LLC v. Peak Entertainment Holdings, Inc.</u>, 11 Misc.3d 1054(A), 815 N.Y.S.2d 493 (Sup.Ct. N.Y.Co. 2006).

  12. The purpose of requiring that redemption be accomplished out of surplus is to protect creditors of the corporation, not the corporation's shareholders. <u>Hayman v. Morris</u>, 179 Misc 265, 38 N.Y.S.2d 782 (Sup.Ct. N.Y.Co. 1942).

  13. Accordingly, where creditors become such, with notice of a corporate purchase of its own stock, and the redemption is in good faith, the purchase does not infringe upon or prejudice the creditor's rights. <u>Nakano</u>, 377 N.Y.S.2d at 1000.

  14. A corporation is "equitably insolvent" at the time it redeems its stock, within the meaning of the New York statute – BCL 513 – prohibiting corporations from redeeming their stock while equitably insolvent, where a corporation is unable to pay its debts as they become due in the usual course of business. <u>In re: Industrial Ceramics, Inc.</u>, 253 BR 323 (W.D.N.Y. 2000).

  15. The existence of working capital – current assets less current liabilities – could indicate that the corporation is equitably solvent. <u>Vowteras</u>, <u>supra</u>.

  16. MRW GROUP has not met its burden of proof that it is insolvent, that redemption will render it insolvent and/or that it lacks sufficient surplus to purchase the shares of stock required to be purchased from REHBERGER.

  17. The monthly sums formerly paid to Travelers for approximately thirteen years prior to 2004 were available since May, 2004 as surplus, as defined by BCL §§513 and 102.

18.     The purchase by the MRW GROUP of the Wren Shares was a transaction controlled by the provisions of BCL §513.

19.     The purchase of the Wren Shares by the MRW GROUP in 2005 constitutes an admission of solvency and evidences the availability of surplus equal to the value of the "book of business" surrendered to MRW GROUP to fund the obligations due to REHBERGER.

20.     MRW GROUP, having entered into an agreement with Wren whereby MRW GROUP redeemed as treasury shares the Wren Shares, is thereby estopped from denying that it is solvent or from claiming that it does not have a surplus or is otherwise unable to pay the sums judicially determined to be paid to REHBERGER.

21.     The "Customer deposits" listed in MRW GROUP's Financial Statement under the heading "Liabilities and Stockholders' Equity" are not liabilities of the company. As trust funds deposited with MRW GROUP, an equal sum should also have been scheduled as an Asset. Therefore, "Customer deposits" are not relevant to the determination of MRW GROUP's solvency or the existence of a surplus.

22.     The "Customer deposits" held by MRW GROUP are Trust Funds earmarked for payment to the respective insurer. Bohlinger v. Zanger, 306 N.Y. 228, 117 N.E.2d 338 (1954), rearg.denied., 306 N.Y. 851, 118 N.E.2d 908 (1954); Estate of Liebman, 189 Misc 282, 60 N.Y.S.2d 482 (N.Y.Surr.Ct. 1945).

23.     MRW GROUP is responsible in a fiduciary capacity for all "Customer deposits" received by MRW GROUP as insurance agent or insurance broker. Insurance Law §2120.

21

24.     Under New York law, an insurance broker has a duty not to commingle funds it receives for transmission to an insurance company and has a duty to keep such funds separate and distinct and properly to transmit them to the insurance company. <u>K. Bell & Associates, Inc., v. Lloyd's Underwriters</u>, 97 F.3d 632 (2d Cir. 1996), on remand 1997 WL 96551.

25.     MRW GROUP had the opportunity to explain why it identified "Customer deposits" as a Liability of MRW GROUP but failed to evidence the existence of such funds on the Balance Sheets as Assets as well. MRW GROUP elected not to take advantage of that opportunity.

26.     Once "Customer deposits" are effectively eliminated as a liability (by including them in the Assets as well as the Liability column) and once "Retained deficit" is eliminated as a liability because it has no impact upon the financial status of MRW GROUP or its ability to conduct business and meet its obligations, it is clear that MRW GROUP's total assets, in every year, substantially exceeded total liabilities.

27.     MRW GROUP is able to pay its debts as they become due in the usual course of business.

28.     MRW GROUP is solvent.

29.     The net assets of MRW GROUP have, in every year, substantially exceeded its stated capital of $10,386.00 as shown in each Financial Statement under the caption of Liabilities and Stockholders' Equity (Plaintiffs' Exhibits "5", "6", "7", "8" and "19").

30.     MRW GROUP has had a surplus in each year since 2000 from which it was

lawfully permitted to make payments to REHBERGER.

Dated: Carle Place, New York
         August 22, 2007

Respectfully submitted,

DOLLINGER, GONSKI & GROSSMAN
Attorneys for Plaintiff

By:

MATTHEW DOLLINGER, ESQ. (0647)
A Member of the Firm
One Old Country Road, Suite 102
P. O. Box 9010
Carle Place, New York 11514-9010
(516) 747-1010

23