```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
FREDERICK REHBERGER,

                   Plaintiff,

        -against-                      MEMORANDUM AND ORDER
                                       05-CV-0210 (JS)(MLO)
MRW GROUP, INC.,

                   Defendant.
----------------------------------X
APPEARANCES:
For Plaintiff:      Matthew Dollinger, Esq.
                    Dollinger, Gonski & Grossman
                    One Old Country Road, Suite 102
                    P.O. Box 910
                    Carle Place, New York 11514-9010

For Defendant:      Michael Jade Jannuzzi, Esq.
                    775 Park Avenue, Suite 205
                    Huntington, New York 11743
```

SEYBERT, District Judge:

## INTRODUCTION

Pending before the Court is an action for declaratory judgment by Plaintiff Frederick Rehberger ("Plaintiff"), seeking enforcement of a Stock Redemption Agreement (the "Agreement") against Defendant MRW Group, Inc. ("Defendant" or "MRW Group"). After holding a bench trial, and considering the parties' submitted findings of fact and conclusions of law, the Court finds Plaintiff's version of the facts more credible and persuasive, and for the reasons stated below, finds in favor of Plaintiff.

## BACKGROUND

The Court presided over a two day bench trial on July 16 and July 17, 2007. All parties presented witnesses and exhibits.

The parties stipulated to a number of facts in their Joint Pre-Trial Order, filed September 7, 2006, and approved by Magistrate Judge Arlene R. Lindsay on September 12, 2006 ("JPTO"). For the basic background facts, the Court refers the parties to the stipulated facts contained in the JPTO. The only issue before the Court was whether Defendant was solvent and had a surplus available to pay Plaintiff the dollar value of his 25.668% share of the corporation.

In January 1987, the Mills-Muller-Wood Corporation and Richtberg & Rehberger, Inc. merged into a new corporation called the MRW Group, Inc. Pl.'s Findings ¶ 1. On June 19, 1987, Plaintiff, as well as the other shareholders, entered into a Stock Redemption Agreement, which set forth the rights, duties, and obligations of the shareholders in the MRW Group. Id. ¶ 2. Plaintiff held 25.668% of the shares of common stock of MRW Group. Id. ¶ 6. Under Article IV of the Stock Redemption Agreement, a stockholder who reaches sixty years of age can require the other stockholders and/or the corporation itself to "buy-out" his/her shares of stock for the value stated in Article VI. Id. ¶ 7. By letter dated November 19, 1999, Plaintiff notified MRW Group that he had reached the age of sixty and wanted to retire and sell his shares in accordance with the last stipulated value of MRW Group, which was $7,000,000.00. Id. ¶ 9.

After Defendant failed to pay for the stock, Plaintiff

commenced an action in the Supreme Court of the State of New York, County of Suffolk. Id. ¶¶ 10,11. In the state court action, Plaintiff sought a declaratory judgment establishing the value of all of the outstanding shares of common stock of the MRW Group at $7,000,000. Id. ¶ 12. In May of 2001, Justice Elizabeth H. Emerson granted summary judgment against the MRW Group. Id. ¶ 13. Thereafter, MRW Group moved to renew arguing that it lacked adequate surplus and would be rendered insolvent if required to purchase Plaintiff's shares in accordance with the Agreement. Id. ¶ 15. Justice Emerson found that Defendant failed to prove that it would be rendered insolvent by paying Plaintiff in accordance with the Stock Redemption Agreement, but Defendant did prove that it did not have adequate surplus to pay for the shares. On August 27, 2001, Justice Emerson modified her prior Order to state that any payments to Plaintiff should be limited to years in which a surplus was available since a corporation may only purchase shares out of surplus. Id. ¶ 16; see also Pl.'s Ex. 2.

On November 20, 2001, Justice Emerson entered an Order finding that (1) the stipulated value of 100% of the corporation's common stock was $7,000,000; (2) Plaintiff owned 25.668% of the common stock; (3) Plaintiff made an offer of delivery on his stock on November 24, 1999; (4) the dollar value of Plaintiff's share of the MRW Group was $1,796,760, and; (5) MRW Group was obligated to purchase Plaintiff's shares pursuant to the Shareholders'

3

Agreement, but any payments to Plaintiff were limited to the years in which a surplus was available in accordance with Sections 513 and 514 of the New York Business Corporation Law. Id. ¶ 17; Defendant's Proposed Findings of Fact and Conclusions of Law ("Def.'s Findings") p.2-3; see also Pl.'s Ex. 3. On June 17, 2002, the Appellate Division, Second Department affirmed Justice Emerson's ruling and remitted the matter for entry of the Judgment declaring the value of the outstanding shares of common stock of the MRW Group to be $7,000,000. Pl.'s Findings ¶ 19. Defendant has paid only $15,000 of the State Court's award.

On January 14, 2005, Plaintiff filed a Complaint in this Court seeking judgment that MRW Group was solvent and had a surplus at all times since Plaintiff's election was made, and that MRW Group is required to perform under the buy-out provisions of the Stock Redemption Agreement. Id. ¶¶ 21, 22. The Court presided over a two day bench trial on July 16-17, 2007. Plaintiff presented two witnesses and nineteen exhibits; Defendant presented neither witnesses nor exhibits.

The Court must decide whether Defendant had a "surplus" to pay for the redemption of Plaintiff's shares at any point after Plaintiff elected to retire in November 1999. The Court must also determine whether Defendant is solvent and whether it would be rendered insolvent if ordered to pay for the redemption of Plaintiff's shares. For the reasons set forth below, the Court

finds that Defendant had a surplus at least since 2000, and would not be rendered insolvent by paying for Plaintiff's shares.

I. Applicable Law

Section 513(a) of the New York Business Corporation Law ("NY-BCL") states that a corporation may not purchase or redeem shares if it is insolvent or would be made insolvent by the purchase, and a corporation may purchase or redeem shares only out of surplus. N.Y. BUS. CORP. LAW § 513(a) (2003). Section 102(a)(8) of the NY-BCL defines "insolvent" as "being unable to pay debts as they become due in the usual course of the debtor's business" and section 102(a)(13) of the NY-BCL defines "surplus" as the excess of net assets over stated capital.[1] N.Y. BUS. CORP. LAW § 102 (2003). The statute defines "net assets" as the amount by which total assets exceed total liabilities, and indicates that stated capital and surplus are not liabilities. N.Y. BUS. CORP. LAW § 102 (2003).

It is well settled that the "burden is on the corporation to establish that, at the time payments were to be made . . . , it

---

[1] NY-BCL section 102 defines "stated capital" as:
> [T]he sum of (A) the par value of all shares with par value that have been issued, (B) the amount of the consideration received for all shares without par value that have been issued, except such part of the consideration therefor as may have been allocated to surplus in a manner permitted by law, and (C) such amounts not included in clauses (A) and (B) as have been transferred to stated capital, whether upon the distribution of shares or otherwise, minus all reductions from such sums as have been effected in a manner permitted by law.

lacked the necessary surplus to make the payments or would thereby have been rendered insolvent." La Sorsa v. Algen Press Corp., 105 A.D.2d 771, 773 (N.Y. App. Div. 1984) (internal quotations and citations omitted); see also Nakano v. Nakano McGlone Nightingale Adver., Inc., 377 N.Y.S.2d 996, 1000 (N.Y. Sup. Ct. 1975) ("[I]n an action to enforce a contract of redemption, the burden of proof rests upon defendant to establish that it would be illegal to proceed with the purchase or redemption); see also LaSorsa v. Algen Press Corp., 481 N.Y.S.2d 716, 718 (App. Div. 1984). "Where such proof is lacking, it is incumbent upon the Trial Judge to award judgment to the [plaintiffs], even where the corporation, at the time of trial, is without sufficient surplus and is, in fact, insolvent." Id. (quoting Nakano, 377 N.Y.S.2d at 998.)

## FINDINGS OF FACT

Based upon the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed conclusions of law, they also shall be considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings. See Miller v. Fenton, 474 U.S. 104, 113-14, 106 S. Ct. 445, 451, 88 L. Ed. 2d 405, 412 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

I.  <u>Plaintiff Entered Into A Valid Stock Redemption Agreement</u>

Defendant is an insurance brokerage agency formed in 1987. (Transcript ("Tr.") 72-73.) Richard Richtberg ("Richtberg") has been in charge of running the company since its inception (Tr. 72.) On or about June 19, 1987, Plaintiff entered into a Shareholders Agreement and a Stock Redemption Agreement with Richtberg, Alan Wren ("Wren") and others. (<u>See</u> Pl.'s Ex. 15; Pl.'s Findings ¶¶ 2-4.) The Shareholders Agreement set forth the rights, duties, and obligations of the shareholders of MRW Group. (Tr. 19; Pl.'s Findings ¶ 4.) The Stock Redemption Agreement has not been modified. (Tr. 19, 42.) Plaintiff was at all times the holder of 25.668% of the shares of common stock of Defendant, worth $1,796,760.00. (JPTO Stip. #1(d); Pl.'s Findings ¶ 6.)

Article IV of the Stock Redemption Agreement stated that when a stockholder attains the age of sixty (60), he can require the other stockholders and/or the corporation itself to "buy-out" his shares of stock for the value stated in Article VI (Pl.'s Findings ¶ 7; Pl.'s Ex. 16.) Plaintiff advised Defendant by letter dated November 19, 1999 that he elected to sell his shares of stock, in accordance with the last stipulated value of MRW Group, which was seven million dollars ($7,000,000.00). (Pl.'s Findings ¶¶ 8-9.) Plaintiff has not been paid the sum he is entitled to be paid pursuant to the Stock Redemption Agreement. (Pl.'s Findings ¶ 10.)

II. <u>Defendant Has Been Solvent Since 2000</u>

Defendant has been solvent at all times since at least the calendar year 2000. Defendant admits that it has paid its bills since 1990 on a reasonably timely basis (Tr. 71-72, 84, 87.). In 2005, Wren surrendered his eleven shares of common stock (the "Wren shares") to Defendant as treasury stock pursuant to the terms of his termination agreement. (Tr. 28; JPTO Stip ¶¶ 8-10.) Defendant admits that it was not made insolvent by its purchase of the Wren Shares. (Tr. 81.)

Additionally, Defendant's financial statements, prepared by its accounting firm, Savino & McIntyre, provided evidence of Defendant's solvency. Plaintiff's expert witness, Howard Fielstein ("Fielstein") provided detailed testimony about his conclusions regarding Defendant's solvency and surplus, based on his examination of Defendant's financial statements and his review of certain intangible assets that are not reflected in the financial statements. (Tr. 81, 118-19.).

Fielstein, an accountant and head of the litigation consulting department of Margolin Winer and Evens, an accounting and business advisory firm, testified that the financial statements from 1993 and 1996 contain a "going concern qualification." (Tr. 116, 124-26.) Fielstein elucidated that the going concern qualification indicated that the accountant preparing the statements was concerned about the ability of the company to

8

operate going forward. (Tr. 124-26.) This qualification is generally placed where a corporation has significant retained deficits as well as operating losses. (Tr. 124.)

The going concern qualification was not listed for any year after 1996, revealing that Savino & McIntyre no longer was concerned about Defendant's going forward basis. (Tr. 124-25.) The expert testified that accounting firms have an obligation to report any concerns regarding a corporation's going forward basis. (Tr. 125.)

Fielstein further testified that Defendant's financial statements listed customer deposits as a liability, whereas there should have been a corresponding line under assets for the financial statements, MRW Group voluntarily choose to contribute to employee 401(k) plans, and MRW Group gave a valuable book of business to Wren. (Tr. 126.)

Based on these observations, Fielstein concluded that Defendant was solvent, had the ability to pay debts as they became due in the usual course of business, and had a surplus giving MRW the ability to redeem Plaintiff's shares in accordance with the Stockholder Agreement without rendering the corporation insolvent. (Tr. 130; Pl's Ex. 20).

The Court agrees that the above evidence indicates that Defendant was solvent at least since the year 2000.

III. <u>Defendant Had A Surplus Since 2000</u>

The Court finds that Defendant has had a surplus since 2000. This conclusion is based on several facts which are examined in detail below. First, the Court finds that Defendant made monthly payments for approximately thirteen years to repay a $3.2 or $3.3 million loan to Travelers Insurance Group, which was paid in full by April, 2004. (Tr. 20-22.) Second, Defendant continuously elected to make voluntary contributions to an employee 401k program. (Tr. 23-25, 76-78.) Third, Defendant overpaid its taxes in 2004 by $10,983.00, which was credited to Defendant's 2005 estimated tax. (Tr. 26-27.) Fourth, Defendant purchased Wren's 10.7 shares in July 2005 and gave Wren a valuable book of business in exchange. (Tr. 29.) Fifth, Defendant was able to pay its repairs and maintenance bills, despite a significant increase in fees in 2002. (Tr. 59-66.) Lastly, MRW Group was able to increase its office salaries in 2005, and had significant year-end cash balances in 2003, 2004 and 2005.

These findings amply lead the Court to conclude that Defendant had a surplus at least since the year 2000. Defendant contends that its retained deficit is proof of its insolvency and lack of a surplus, however, the Court rejects that argument in light of the findings of fact detailed below.

    A.   <u>The Travelers Loan Payments</u>

On January 10, 1990, Defendant borrowed at least

10

$3,200,000.00 from Aetna Casualty and Surety Company ("Aetna"). (Tr. 20, 70.) At some point thereafter, Aetna assigned the loan to Travelers Group. (Tr. 20.) The purpose of the loan was to purchase the shares of certain shareholders who Defendant viewed as trouble-makers. (Tr. 20.) The monthly payments were approximately $38,000, but on various occasions, the payments were adjusted downward and for a few years, Defendant paid only the interest on the loan. (Tr. 20-22.) In August of 2001, Travelers Group adjusted the payments to $13,851 per month. (Pl's Ex. 6.) In 2001, the unpaid balance on the Travelers loan was $389,849.00. (Tr. 137.) In 2002, the outstanding balance was reduced to $247,991.00, and by the end of 2003, the unpaid balance was $95,122.00. (Tr. 137, 138; see also Pl.'s Exs. 6, 19.) Approximately $150,000 of the loan was paid off in 2002 alone, notwithstanding that the required monthly payments were only $13,851. The loan was paid off in full by April 2004. (Tr. 22, 138; JPTO Stip ¶ 6.)

Fielstein testified that Defendant's financial statements indicated that there were adequate sums to pay the obligation to Travelers, and that Defendant's financial status did not change in the years subsequent to 2004 with the exception of an increase in employee salaries and an increase in gross income. (Tr. 139.). Fielstein concluded that the funds previously earmarked to Travelers should have been available to fund Plaintiff's redemption after MRW Group paid off the loan in 2004. (Tr. 139.) The Court

11

finds that Defendant's ability to repay the Travelers loan clearly shows that Defendant could have redeemed Plaintiff's shares, and further finds that funds previously used to pay off the loan were available to Defendant from 2004 onwards to pay for Plaintiff's shares.

    B.    <u>401k Contribution Program For Employees</u>

Defendant established a 401k program for its employees in 1988. (Tr. 23.) Richtberg testified that the corporation elected each year to continue the program. (Tr. 24.) Under the Profit Sharing Plan, employees contributed up to 15% of their gross wages, up to the maximum amount allowed by law, and MRW Group contributed up to 3% of each employee's contribution, up to a maximum of $3,000 per employee. (Pl.'s Findings ¶ 73; Pl.'s Exs. 5, 6, 7, 8.) The company also had the option of contributing up to 2% of each employee's wages for employees who were not participants in the plan. MRW contributed $73,911.00 in 1999, $79,037.00 in 2000, $53,214.00 in 2001, $80,955.00 in 2002, $73,599.00 in 2003, $74,653.00 in 2004, and $86,480.00 in 2005. (Pl.'s Exs. 5, 6, 7, 8.) The Court finds that the elective payment of the 401k Contribution Program evidences both the solvency of Defendant and the existence of a surplus each year.

    C.    <u>Overpayment Of Taxes In 2004</u>

In 2004, Defendant overpaid its income tax by $10,983.00. (Tr. 26; Pl.'s Ex. 10) According to Defendant's 2004 income tax

12

return for 2004, Defendant elected to have the overpaid amount of $10,983 credited to the future taxes of the corporation (Tr. 26-27; see Pl.'s Ex. 10.) Richtberg testified that he never considered sending the excess $10,983.00 to Plaintiff. (Tr. 27.) The nearly $11,000 overpayment in income taxes is an additional indication of Defendant's surplus since 2000.

    D.    <u>The Wren Shares And The Book Of Business</u>

The Wren shares provide another indicia of Defendant's surplus. Wren held 10.7 shares of stock in MRW Group prior to July 2005. (Tr. 28; JPTO Stip ¶¶ 8-9.) In July 2005, Defendant purchased Wren's shares as treasury shares. (Tr. 28-29.) Richtberg testified that the purchase of the Wren Shares did not render Defendant insolvent. (Tr. 81.) Moreover, in consideration for Wren's shares, Defendant agreed to assign to Wren Defendant's "book of business," a valuable commodity for Defendant. (Tr. 34-35, 45, 47; Pl.'s Ex. 17.) Richtberg defined a book of business as a volume of insurance written by a producer which may be purchased or sold. (Tr. 33.) Purchasing a book of business may increase a company's gross revenue (Tr. 33.)

Defendant waived a restrictive covenant which otherwise would have prevented Wren from pursuing any of the accounts in the book of business, and gave Wren the right to certain accounts in the book of business. (Tr. 42-43.) Defendant committed itself to pay Wren 50% of the commission earned during the following two

years from any accounts that were part of the book of business that chose to remain as a client of Defendant. (Tr. 44-45; Pl.'s Ex. 17, p. 4) It would have cost Defendant approximately $250,000-$300,000 to replace the book of business. (Tr. 14, 131-132.) The Court finds that Defendant's ability to depart with a valuable commodity and commit to pay a shareholder commissions is yet another indication of Defendant's surplus.

E.  Fees For Repairs And Maintenance

Defendant's ability to pay substantially increasing repairs and maintenance fees is additional evidence that it had a surplus since 2000. Richtberg testified that Woodside Maintenance ("Woodside"), an entity owned by Richtberg's son, performed certain repairs and maintenance work for Defendant's three offices. (Tr. 59-60.) According to Defendant's financial statements and Richtberg's testimony, maintenance and repairs cost $86,720 in 2000. (Tr. 61; Pl.'s Ex. 5) In 2002, maintenance and repairs amounted to $135,034, and in 2003, repairs and maintenance expenses increased to $155,943. ((Tr. 60,64; Pl.'s Ex. 6,7.)

Richtberg was unsure what work was performed that resulted in the expenditure of the substantial annual sums for repairs and maintenance. Although Richtberg stated that "a lot of that repair and maintenance also goes to the computer system," the expense lists revealed a separate listing for "computer fees and services." (Tr. 61, 63; Pl.'s Exs. 5-8.) Fielstein testified that,

14

in his review of Defendant's books and records, he did not find any evidence to support a payment in excess of $130,000 since 2002 for repairs and maintenance. (Tr. 135.) The fact that Defendant was able to pay these increasing expenses is additional evidence that Defendant had a surplus since 2002.

    F.    <u>Gross Receipts, Cash Balances, And Office Salaries</u>

Richtberg testified that, in 2005, Defendant paid $1,900,810 in office salaries, an increase from the $1,767,292 paid in 2004. (Tr. 69.) Additionally, MRW's financial statements show a year end cash balance of $547,251.00 in 2003, $1,031,469.00 in 2004, and $1,079,669.00 in 2005, and Defendant's Internal Revenue Service Forms show over five million dollars in gross receipts or sales for the years 2004 and 2005. The increase in salaries, significant gross receipts or sales, and substantial year-end cash amounts are further evidence of the existence of a surplus.

    G.    <u>The Retained Deficit Does Not Negate Existence Of A Surplus</u>

Defendant's chief argument is that the financial statements from the years 1999-2005 reflect a negative net figure and that Defendant did not have a surplus during those years. (Def.'s Findings p.5.) However, Fielstein opined that the company's retained deficit does not impact Defendant's solvency or its ability to operate as a profitable business. (Tr. 130-131.) The deficit was not an actual obligation of the company because it was not actually owed to anyone and therefore no payments were

15

necessary under the deficit. Additionally, the deficit did not impact MRW Group's taxes. (Tr. 122, 127.)

Defendant has not produced any evidence to negate Fielstein's conclusions. The Court has not been supplied with a list of creditors with respect to the retained deficit and the amounts owed to each. Defendant asserts that a deficit existed for many years, but has not stated whether the asserted deficit was an actual deficit or a book deficit.

Although Defendant has shown that its short term liabilities increased by approximately $880,000 between 2003 and 2005, evidence of this debt does not impact the Court's finding that Defendant had a surplus since 2002. (Tr. 161-62; Pl.'s Exs. 7-8.) The findings, collectively, represent that Defendant had the funds to perform according to the Stock Redemption Agreement.

Based on the findings of fact above, the Court finds that Defendant was solvent since Plaintiff elected to retire in November 1999 and that Defendant had a surplus since 2000. The facts do not suggest that Defendant will be made insolvent if it is ordered to perform under the Stock Redemption Agreement.

CONCLUSION

Based on these findings of fact, the Court finds that Defendant has not proven that redemption will render it insolvent or that it lacks sufficient surplus to purchase the shares. Plaintiff is entitled to the relief requested. Therefore, Defendant is required to perform under the "Buy-Out Provisions" of the Stock Redemption Agreement and is ordered to pay Plaintiff the amount due pursuant to the State Court Award, $1,796,760.00 plus interest, in quarterly payments of principal and interest in accordance with the Stock Redemption Agreement, with credit for the $15,000.00 previously paid. The Court further orders that Defendant pay the following sums to be applied in reduction of the amount due: (a) the sum of money elected to be paid by MRW Group to its employees as profit sharing during the years 2002, 2003, 2004, and 2005, in the cumulative amount of $315,687.00, (b) the sum of $80,000.00 per year, payable monthly on a going forward basis, representing the sum paid by MRW Group to its employees as profit sharing commencing retroactively for the calendar years 2006 and 2007, totaling $160,000.00, and (c) a sum equal to the monthly payments of $13,851.00 paid by MRW Group to Travelers Group on a monthly basis retroactively from May 1, 2004 to July 2007, totaling $540,189.00.[2]

---

[2] The Court rejects Plaintiff's request for a sum equal to the value of the book of business transferred to Wren because Plaintiff has not proven the actual value of the book of

Accordingly, the Court orders the Clerk of the Court to enter judgment in favor of the Plaintiff.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: Central Islip, New York
March 31, 2008

---

business. Although Plaintiff indicates that the value was "at least $250,000.00," the Court finds that this value is speculative and was not proven at the trial. Accordingly, the Court declines to include the value of the book of business in its judgment.